IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 15–CR–30134-NJR |
| | ) | |
| | ) | |
| MALCOLM K. LEE, SR., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Defendant Malcolm K. Lee, Sr. was arrested on July 28, 2015, on a criminal complaint (Doc. 1). On August 21, 2015, the grand jury returned a four-count indictment, which was then superseded on January 21, 2016 (Docs. 25, 103). The superseding indictment charges Mr. Lee with two counts of kidnapping in violation of 18 U.S.C. § 1201(a)(1), one count of enticement in violation of 18 U.S.C. § 2422(a), and one count of brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i) and (ii) (Doc. 103).

This matter is currently before the Court on various pretrial motions filed by the parties. Specifically, Mr. Lee filed a motion to suppress the evidence seized during the search of his semi-truck on July 25, 2015, the search of his residence, and the searches of his cell phones (Doc. 98). He also filed a motion to dismiss Count 3 of the superseding indictment and requested the release of the grand jury transcripts (Docs. 88, 112). After the motions were fully briefed, an evidentiary hearing was held on May 18, 2016 (*see*

Doc. 124). Following the hearing, the Court ordered the parties to submit briefs supplementing their arguments as needed in light of the testimony given during the hearing. In his supplemental brief, Mr. Lee argued, in part, that the precision location data obtained from his Tracfone should be suppressed (Doc. 130). In response, the Government filed a motion asking the Court to strike that argument (Doc. 132).

The Court has fully considered the briefs and documentary evidence submitted by the parties as well as the testimony provided at the hearing. For the reasons set forth below, the Government's motion to strike is granted, and Mr. Lee's motions are denied.

## FINDINGS OF FACT

The following findings of fact are based on the testimonial and documentary evidence before the Court. In particular, the Court heard testimony from Detective Chad Hogard of the Jonesboro Police Department; Special Agent Stephen Cupp from the FBI's field office in Jonesboro, Arkansas; and Special Agent Daniel Cook from the FBI's field office in Fairview Heights, Illinois.[1] The Court also heard testimony from Defendant Malcolm Lee. At the hearing, the Court admitted documentary evidence, including photographs and video clips. Prior to the evidentiary hearing, the parties submitted reports completed by the police, the criminal complaint and supporting affidavit, and the various search warrants and supporting affidavits (Doc. 1; Docs. 117-1 through 117-6; 128-1 through 128-3). All of the facts are undisputed except where noted.

The two victims in this case posted an ad for sexual services on the website backpage.com on June 15, 2015. A man responded to the ad from a phone with a 470 area

---

[1] For simplicity's sake, these men and all other law enforcement officials are collectively referred to as "the police" throughout this Order.

code, and the victims arranged to meet him at the Flying J Truck Stop in Pontoon Beach, Illinois, around 4:35 p.m. on July 15th. The victims claim that the man pulled a gun on them in the parking lot of the Flying J and forced them into his semi-truck. They further claim that the man put duct tape over their eyes and mouths, bound their hands with zip ties, and bound their feet with rope/cable before driving them to another, unknown location and repeatedly raping them. According to the victims, after a number of hours, the man drove to yet another location where he forced them to get out of the truck with their hands still bound and duct tape over their eyes. When the man drove off, the victims ran to the Blue Springs Restaurant in Highland, Illinois, where they called 911.

The victims told officers that their assailant's semi-truck was blue with a white trailer. They also told officers, in pertinent part, that their assailant forced them to use baby wipes to clean themselves and to urinate in a plastic-lined bucket inside the truck. They also reported seeing an "M&M blanket" inside the truck. Officers searched the area where the victims were reportedly released, and they found silver duct tape, zip ties, and baby wipes on the ground. FBI agents then obtained search warrants for call logs and location data for the phone with the 470 area code that the assailant used to contact the victims. The agents began monitoring the location data for the phone (which they learned was a Tracfone) on July 19, 2015.

Initially, the agents did not get any location pings from the Tracfone, which indicated to them that the phone was turned off. On July 23rd at roughly 7:00 p.m., however, the agents started getting pings from the phone. Agent Daniel Cook plugged the latitude and longitude coordinates for the phone into Google Earth and learned the

phone was in South Bend, Indiana. The next day, the phone traveled up around Chicago, Illinois, and then headed south, where it ultimately ended in Jonesboro, Arkansas, around 8:00 or 9:00 p.m. According to Google Earth, the latitude and longitude coordinates for the phone indicated that it was at or near Bill's Fresh Market on Route 49 in Jonesboro. After the phone remained stationary for about an hour, Agent Cook reached out to the local police to initiate surveillance at the location of the pings. Around midnight on July 25th, the police observed a white semi-truck with a white trailer in the parking lot of Bill's Fresh Market. The truck had an Illinois license plate bearing the number P797587 and had "TATUS TRANSPORTATION USDOT 2177518" written on the side of the cab.

The police watched the truck and determined that it was not running. Detective Chad Hogard climbed the steps of the truck and knocked on the driver's side window, the passenger side window, and the sleeper part of the truck to see if anyone was inside. There was no answer. The police called the Tracfone but could not hear it ringing or vibrating inside the truck and could not otherwise locate the phone.

Agent Cook asked the local police to tow the truck, but Detective Hogard refused to do so because the truck was white, not blue like the victims reported, and he did not know if the phone was inside the truck. Detective Hogard offered to take some photos of the truck. He took photos of the truck's exterior, including the license plate and the DOT number. He took photos of the truck's interior through the windows by standing on the steps of the truck and climbing on the hood of the truck. From the passenger-side window, Detective Hogard photographed an orange five-gallon bucket and zip ties on

the floor behind the driver's seat. Through the windshield, Detective Hogard photographed the sleeping area, including a brown blanket with the M&M candy logo. He also photographed a road map on the dashboard of the truck showing South Bend, Indiana, and Chicago, Illinois, which is consistent with the Tracfone's path of travel. Detective Hogard also noticed a plastic bag containing some torn items of clothing near a trashcan that was in front of the truck.[2] Hogard photographed the trashcan and collected the clothing as evidence.

Agent Cook ascertained that the DOT number was assigned to Status Transportation and contacted the company. He was not able to get a hold of someone until around 8:30 or 9:00 a.m. on July 25th. The company told Agent Cook that Malcolm Lee was the assigned driver of the white semi-truck and that Mr. Lee lived in Jonesboro. The company gave Agent Cook two phone numbers for Mr. Lee, including one for an iPhone with an 870 area code. Shortly thereafter, around 9:09 a.m., Mr. Lee called Agent Cook from the iPhone. Agent Cook testified that he told Mr. Lee he was "investigating trucking companies and . . . asked him what he currently had in the trailer of his truck."[3] Agent Cook further testified that he asked Mr. Lee if agents could "come out and take and look at what's in the back of his trailer."[4] Mr. Lee told Agent Cook the trailer was unlocked, and the agents were free to look inside; however, Agent Cook said he didn't want to look in trailer without Mr. Lee present. Because Agent Cook was not in Jonesboro, another agent, Stephen Cupp, contacted Mr. Lee and arranged to meet him at

---

[2] The photographs show the trashcan was approximately one parking space away from the front of the truck (Government's Exhibit 23).
[3] Agent Cook's report matches this testimony (Doc. 117-1, p. 3).
[4] Agent Cook's report also matches this testimony (Doc. 117-1, p. 3).

Bill's Fresh Market at 11:30 a.m.

Agent Cupp and Detective Hogard both arrived at the market at around 11:00 a.m. on July 25th. Mr. Lee arrived about ten minutes later. Mr. Lee was with his wife, and she stayed in the car while he got out to talk to the officers. Agent Cupp testified that he told Mr. Lee he was assisting an FBI Office in Illinois in investigating a cargo freight issue.[5] Cupp said he didn't know much about the specifics, but he understood that Mr. Lee had agreed to a search of "the truck and trailer." Cupp presented Mr. Lee with a consent to search form, which he read to Mr. Lee. He then gave the form to Mr. Lee so he could review it himself. Mr. Lee signed the form. The form presented to the Court indicates that the trailer *and* the truck were to be searched. Mr. Lee testified, however, that the form was not filled out when he signed it. Agent Cupp disputes that assertion and claims he filled out the consent form while he was waiting for Mr. Lee to arrive. Detective Hogard testified that Agent Cupp was, in fact, filling something out while they were waiting for Mr. Lee, but he did not know if it was the consent to search form because he never asked what it was or looked at it.

It is undisputed that after Mr. Lee signed the consent form, the men walked to the back of the truck where Mr. Lee opened the unlocked doors to the trailer. Agent Cupp entered the trailer, walked around, and photographed the cargo. Detective Hogard testified that, while Agent Cupp was in the trailer, he stood outside the trailer with Mr. Lee and some other patrol officers. After photographing the cargo, Agent Cupp asked Mr. Lee if he had any paperwork for the cargo. Mr. Lee indicated the paperwork was in

---

[5] Agent Cupp's report indicates that he told Mr. Lee that "agents were investigating an issue with some freight that Lee possibly had picked up on his current haul" (Doc. 117-1, p. 5).

the cab of the truck. The men then walked from the trailer to the cab of the truck where Mr. Lee pulled a key out of his pocket and unlocked the cab. Agent Cupp climbed up into the driver's seat of the cab. Detective Hogard went around and climbed into the passenger seat of the truck. Agent Cupp located the paperwork above the steering wheel and photographed it. He testified that Agent Cook previously told him to look for an orange bucket, an M&M blanket, a pistol, and the Tracfone. The M&M blanket was immediately noticeable on the lower sleeping bunk, as was the orange bucket on the floor.[6] Those items were seized. A cut white zip tie from under the blanket, two latex gloves, and a Motorola cell phone were also retrieved from the cab of the truck.

While Agent Cupp and Detective Hogard were searching the cab, Mr. Lee stood outside the cab with the patrol officers. He was not handcuffed or restrained in any way. Cupp and Hogard both testified that Mr. Lee never asked them to stop the search. As the search concluded, Mr. Lee told the officers that he needed to go and asked them to hurry up. Agent Cupp gave Mr. Lee a receipt for the items taken. At that point, Mr. Lee told Agent Cupp that the Motorola phone was an old phone that he had not used in a long time. Agent Cupp asked Mr. Lee about the Tracfone with the 470-number. Mr. Lee said multiple times that the 470-number was not his, and he did not recognize it. Agent Cupp told Mr. Lee that he had information that the phone was inside the truck, but Lee still denied any knowledge of a phone with that number. Mr. Lee then locked his truck and left.

After Mr. Lee drove away, Detective Hogard walked over to the trash can in front of the truck. He observed two white interlocked zip ties near the trashcan that were not

---

[6] The photographs corroborate this testimony (*see* Government's Exhibits 5, 6, 7, 8, 10, 11, 17, 18).

there the night before. He also noticed a phone lying in the trash can that was not there the night before—it was the Tracfone. Agent Cupp took the zip ties and the Tracfone from the trashcan. He believes that Mr. Lee removed the Tracfone from the truck earlier that morning based on surveillance footage from a bank close to Bill's Fresh Market. In short, the footage shows that at around 9:30 a.m.—after Mr. Lee had spoken to Agent Cook—Lee pulled up behind the semi-truck in a white SUV, walked to the front of the truck and stepped up into the cab, then climbed down and walked to the front of the truck near the trash can.

Following the search, Agent Cook reached out to the police in Pontoon Beach, Illinois, who went back through the video surveillance and observed Mr. Lee's truck leaving the Flying J parking lot on the day of the crime around 4:35 p.m. Agent Cook also presented photo lineups to the victims, both of whom positively identified Malcolm Lee as the man who kidnapped and assaulted them.

The FBI obtained a warrant to arrest Mr. Lee on Sunday, July 26th. By that time, however, the semi-truck was gone from the parking lot of Bill's Fresh Market. The FBI was able to locate Mr. Lee on July 28, 2015, sitting inside of his truck at a truck stop in Seminole, Oklahoma, where he was arrested. His truck was impounded incident to his arrest. Following Mr. Lee's arrest, the FBI obtained a number of search warrants. In pertinent part, they obtained a search warrant for Mr. Lee's semi-truck and any computer, smart phone, GPS, or electronic media storage device found inside the truck. That search turned up more zip ties, duct tape, and the iPhone; the police also gathered forensic evidence from inside the truck. The agents did not, however, find a firearm or

video equipment, so they obtained a warrant to search Mr. Lee's home in Jonesboro. The search of the house turned up only two BB guns. The FBI also obtained a warrant for the Motorola phone seized from the truck on July 25th; that search revealed Mr. Lee used the phone to search for escort services.

<h2 align="center">MOTION TO SUPPRESS</h2>

Mr. Lee claims his Fourth Amendment rights were violated during the search of his semi-truck on July 25, 2015, the search of his residence, and the searches of his cell phones; he asks the Court to suppress the evidence seized during those searches (Doc. 98). In his supplemental brief, he also asks the Court to suppress the precision location information obtained from his Tracfone (Doc. 130).

### *General Legal Standard*

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. In order to "compel respect for the constitutional guaranty," the United States Supreme Court created the exclusionary rule. *Davis v. United States*, 131 S.Ct. 2419, 2426 (2011) (citing *Elkins v. United States*, 364 U.S. 206, 217 (1960)). When applicable, that rule forbids the use of evidence obtained by police officers in violation of the Fourth Amendment. It is well-established, however, that a violation of the Fourth Amendment does not necessarily mean that the exclusionary rule applies. *Herring v. United States*, 555 U.S. 135, 140 (2009) ("We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation.") It applies only when the benefits of deterring future Fourth Amendment violations outweighs the heavy costs of suppressing evidence. *Herring*, 555 U.S. at 141. "The principal cost of

applying the rule is, of course, letting guilty and possibly dangerous defendants go free." *Herring* 555 U.S. at 141 (citing *Leon*, 468 U.S. at 908); *Davis*, 131 S.Ct. at 2427 ("Exclusion exacts a heavy toll on both the judicial system and society at large" because "its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment.") As a result, exclusion "has always been our last resort, not our first impulse." *Herring*, 555 U.S. at 140 (citing *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

### *Precision Location Information*

Agents sought and obtained a search warrant authorizing them to collect precision location information from Mr. Lee's Tracfone. SD-IL Case Number 15-mj-4014-PMF (Docs. 1, 2). In his supplemental brief submitted after the evidentiary hearing, Mr. Lee argued that the location data gathered from his Motorola cell phone should be suppressed (Doc. 130). In response, the Government filed a motion asking the Court to strike Mr. Lee's argument as untimely (Doc. 132).

The Court agrees with the Government that Mr. Lee's argument is untimely and must be stricken. The deadline for filing pretrial motions was January 12, 2016 (Docs. 85, 87). But Mr. Lee did not make any argument regarding the collection of the location data in his original motion to suppress, nor did he mention that he may want to do so in the future (*see* Doc. 98). He did not make any argument regarding the location data in his reply brief (*see* Doc. 122). Mr. Lee also did not challenge the collection of the location data at the suppression hearing or ask the Court for leave to file an untimely motion to suppress. Instead, Mr. Lee waited to make his argument until he submitted his

supplemental brief submitted on June 1, 2016 (Doc. 130). In other words, he waited almost six months after the deadline for filing pretrial motions to make his argument. And he did not give the Court any reason, much less a good reason, as to why he waited so long (*see* Doc. 130). *See* FED. R. CRIM. P. 12(c) (requiring a party to show good cause why the court should consider an untimely motion to suppress). Consequently, the Government's Motion to Strike (Doc. 132) is granted. The Court will not consider Mr. Lee's argument, and the motion to suppress is denied regarding the location data obtained from his Tracfone.

### Search of the Residence

Agents sought and obtained a warrant authorizing them to search Mr. Lee's residence in Jonesboro, Arkansas (Doc. 117-5). In his motion, Mr. Lee made a perfunctory, one-sentence argument that the evidence seized during the search of his residence should be suppressed because there was "no probable cause to believe evidence related to [the charged] offenses would be found in Jonesboro Arkansas let alone within the private bedroom of Defendant's son." (Doc. 98, p. 8). He did not expand on this argument in his reply brief or his supplemental brief; in fact, he never even mentioned the search of his residence in those briefs (*see* Doc. 122; Doc. 130).

As the Court indicated in its previous order, Mr. Lee's argument was undeveloped and amounted to nothing more than a conclusory assertion (Doc. 124). Because Mr. Lee failed to make any legal or factual argument on the issue, it is waived. *See, e.g., United States v. Collins*, 796 F.3d 829, 836 (7th Cir. 2015) ("The parties—not the courts—must research and construct available legal arguments. . . . Accordingly, this

Court has long warned that 'perfunctory and undeveloped arguments' are deemed waived.") (citations omitted); *accord United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011) (citing *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)). The motion to suppress is denied with respect to the search of Mr. Lee's residence.

*Search of the Cell Phones*

Mr. Lee argues that the data seized from his cell phones must be suppressed because the searches were conducted without a warrant or pursuant to a defective warrant (Doc. 98). In the motion to suppress, however, he did not specify what phones he was talking about or indicate anything about the nature of the searches (Doc. 98). Based on the evidence before the Court, it appears there were three phones seized and searched by the police: the Tracfone found in the trash can at Bill's Fresh Market on July 25, 2015, the Motorola phone found in Mr. Lee's truck on July 25, 2015, and the iPhone found in Mr. Lee's truck on July 30, 2015. As best the Court can tell, the Tracfone was searched without a warrant, while warrants were obtained for the Motorola phone and the iPhone (Docs. 117-3; 117-6; 128-3).

To the extent Mr. Lee's motion can be read to attack the search of the Tracfone, that argument must be rejected. As indicated in the Court's previous order (Doc. 124), Mr. Lee did not dispute the Government's assertion that he abandoned the Tracfone in a trashcan (Doc. 124), and "[a]bandoned property is not subject to Fourth Amendment protection . . . ." *United States v. Basinski*, 226 F.3d 829, 837 (7th Cir. 2000).

As for the Motorola phone and the iPhone, any argument regarding the deficiencies in the warrants supporting the searches of these two phones must be

rejected. Mr. Lee made a generalized argument that the warrants were overbroad and unsupported by probable cause, but he only discussed these principles in the abstract (Doc. 98, pp. 6–7). He never discussed how those principles applied to the facts of his case (*see* Doc. 98). In fact, he never even referenced a particular phone or cited to a particular warrant (*see* Doc. 98).

The same holds true for his reply brief. Mr. Lee provided a lengthier discussion of the particularity requirement for warrants, but again, it was only in the abstract (Doc. 122, pp. 9–12). He also argued that his case is similar to *United States v. Winn*, 79 F.Supp.3d 904 (S.D. Ill. Feb. 9, 2015)—a case that was previously before the Court in which evidence from a cell phone was suppressed because the warrant was overbroad (Doc. 122, pp. 10, 11). But Mr. Lee's argument consists solely of block quotations from the order in *Winn*. He made no attempt to explain how the facts in *Winn* were analogous to the facts of his own case.

Simply put, Mr. Lee identified possible arguments, but did not affirmatively make them. The Court also notes that the warrants at issue in this case are wildly different than the documents in *Winn*. Here, the warrants are supported by lengthy affidavits in which the agent described what data he was looking for on the phones and explained how that data might be helpful to the investigation (Docs. 117-3; 117-6; 128-3). Thus, on their face, the warrants appear to pass constitutional muster. And Mr. Lee's general discussion of the law, divorced from application to the facts of this case, is insufficient for the Court to determine otherwise. *See United States v. Kirkland*, 567 F.3d 316, 322 (7th Cir. 2009) ("Courts are not in the business of formulating arguments for the

parties; it is defense counsel's job to develop suppression arguments in a meaningful way so that the government has an adequate opportunity to respond and the district court to make an informed decision.") (internal quotation marks and citations omitted). The motion to suppress is denied with respect to the searches of Mr. Lee's cell phones.

*Search of the Semi-Truck*

As recounted above, Mr. Lee's semi-truck was searched on July 25, 2015. He takes no issue with the search of the trailer; he challenges only the legality of the search of the truck's cab. Both parties make a multitude of arguments, many with sub-arguments, which are spread out across the legal briefs. It appears, however, that the arguments boil down to three main issues: (1) whether the police could have searched the cab during the early morning hours of July 25th, prior to their meeting with Mr. Lee; (2) whether the search of the cab after the police met up with Mr. Lee on July 25th was permissible; and (3) if the search of the cab was problematic, whether the evidence seized is nonetheless admissible under the inevitable discovery doctrine.

### 1.  <u>Could the Police Search the Cab Prior to Meeting with Mr. Lee?</u>

The Government argues that, during the early morning hours of July 25th when the police located Mr. Lee's semi-truck in the parking lot of Bill's Fresh Market, the police had probable cause to search the cab pursuant to the automobile exception and without any consent from Mr. Lee (Docs. 117, 129).

The automobile exception to the Fourth Amendment warrant requirement permits police to search a vehicle without a warrant so long as there is probable cause to believe it contains evidence of criminal activity. *United States v. Washburn*, 383 F.3d 638,

641 (7th Cir. 2004). "Probable cause to search exists where there is a fair probability that an officer will find contraband or evidence of illegal activity at a specified location based on the totality of the circumstances." *Id.* at 642 (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)).

Here, location data indicated that the Tracfone used to set up the meeting with the victims was in South Bend, Indiana, on July 23, 2015. The next day, the location data indicated that the Tracfone traveled from South Bend, up around Chicago, and then headed south to Jonesboro, Arkansas, where it remained stationary. FBI Agent Daniel Cook determined the phone was at Bill's Fresh Market on Route 49, and at his behest, the Jonesboro police initiated surveillance at that location. The police observed a white semi-truck in the parking lot of the market; there were no other trucks on the lot. They determined the truck was not running and was not occupied. Detective Chad Hogard then photographed the interior of the cab through the driver-side window and the passenger-side window by standing on the steps of the cab and through the windshield by climbing on the hood of the truck. Visible in the photographs is an orange bucket, an M&M blanket, and a road map showing the geographic areas the Tracfone had traveled.

The Government argues that the police had probable cause to search the truck given that it was the only truck in the same location as the Tracfone, and the photographs taken by Detective Hogard showed a map matching the Tracfone's travel route and items previously described by the victims (Doc. 129). Mr. Lee disagrees. He claims that photographs of the cab's interior cannot be used to support probable cause because police obtained them by trespassing onto his truck, which violated the Fourth

Amendment (Doc. 130). He also claims that without the photos, the police were left with only the proximity of the truck to the pinging Tracfone, which was insufficient to establish probable cause because the truck was not the color the victims described, and the police did not know if the phone was inside the truck (Doc. 130). In the event probable cause did exist, Mr. Lee claims that the automobile exception does not apply in this case (Doc. 122).

In considering the parties' arguments, the undersigned has determined that the issue of whether the police had probable cause to search the cab in the early morning hours of July 25th is not as cut and dry as it may seem. The Court declines to engage in what is sure to be a lengthy analysis when there are less-complicated, alternative reasons to uphold the search of the cab. The Court will address Mr. Lee's arguments regarding the applicability of the automobile exception later in the Order when it comes back into play.

**2.  <u>Could the Police Search the Cab During the Meeting with Mr. Lee?</u>**

The Government also argues that the warrantless search of the cab of the truck was permissible because Mr. Lee consented to the search (Docs. 117, 129). Mr. Lee argues that although he consented to a search, his consent was invalid because it was obtained through false pretenses (Docs. 98, 122). Specifically, the agents told Mr. Lee that they were investigating trucking companies and possible issues with his freight. Mr. Lee testified that if he had been told the investigation related to prostitution in Illinois, he would not have consented to the search. In the alternative, Mr. Lee argues that even if his consent was valid, he consented to only a search of the trailer and therefore the police

exceeded the scope of his consent when they searched the cab (Docs. 98, 122).

### a.  Validity of Mr. Lee's consent

The Court first examines whether the lies the police used to obtain Mr. Lee's consent rendered that consent involuntary. Warrantless searches are permissible when the defendant voluntarily consents to the search. "The government bears the burden of demonstrating by a preponderance of the evidence that consent to search was in fact voluntarily given, and not the result of . . . coercion, express or implied." *United States v. Contreras*, 820 F.3d 255, 269 (7th Cir. 2016) (citing *United States v. Johnson,* 495 F.3d 536, 541 (7th Cir. 2007)). In determining whether a defendant voluntarily consented, courts should consider "the totality of the circumstances," including the characteristics of the defendant, such as age, education, and intelligence; whether the defendant was advised of his constitutional rights; how long the defendant was detained prior to consent; whether the defendant consented immediately or after police made several requests; whether the police used physical coercion; and whether the defendant was in custody. *Contreras*, 820 F.3d at 269 (citing *United States v. Ruiz,* 785 F.3d 1134, 1146 (7th Cir. 2015)). Other circuits advise that courts also should consider whether law enforcement's deceit or trickery prompted the defendant to consent. *United States v. Vazquez*, 724 F.3d 15, 19 (1st Cir. 2013); *United States v. Harrison*, 639 F.3d 1273, 1278-79 (10th Cir. 2011); *United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011).

Here, it is undisputed that Mr. Lee consented to a search. The question for the Court is whether the agents' misrepresentation that they were investigating trucking companies and possible issues with his freight rendered Mr. Lee's consent involuntary.

The Court does not believe that it did given the totality of the circumstances.

Mr. Lee was 43 years old, had graduated from high school and technical college, and had been a truck driver for ten years. He consented more than once to a search—initially, he offered to let the agents look in the trailer without even being present, but when the agents didn't want to do that, Mr. Lee willingly met them at the truck where he signed a consent to search form. There is no indication that he expressed hesitation or fear, and there is no indication that police had to ask more than once for his consent. There is also no indication that the police used threats or commands (or even an authoritative tone of voice), physical intimidation, show of force, or punishment to extract the consent. The only factor that suggests Mr. Lee's consent was coerced is the fact that the agents' misrepresentation about the purpose of the search prompted his consent.

Of course, "not all deceit and trickery is improper." *Harrison*, 639 F.3d at 1280; *United States v. Hardin*, 539 F.3d 404, 424 (6th Cir. 2008) ("As a general proposition . . . a ruse . . . does not usually violate individuals' rights.") Deceit is only improper if it is used to imply an individual has no choice but to permit the search. *Harrison*, 639 F.3d at 1280; *Hardin*, 539 F.3d at 425; *United States v. Escobar*, 389 F.3d 781, 786 (8th Cir. 2004); WAYNE R. LAFAVE ET AL., 2 CRIMINAL PROCEDURE § 3.10(c) (3d ed. 2007). *See also* WAYNE R. LAFAVE, 4 SEARCH & SEIZURE § 8.2(n) (5th ed.). For example, in *United States v. Harrison*, the Tenth Circuit held that a tenant's consent to search his apartment was invalid because ATF agents falsely claimed that someone had planted a bomb in the apartment, which implied the tenant had no choice but to permit the search because he and others in

the building were in danger. 639 F.3d at 1280. *See also Hardin*, 539 F.3d at 424, 425 (even if apartment building manager, acting as agent of police, "*did* receive consent, the ruse regarding the water leak presented a situation in which an individual would feel 'no choice but to invite the undercover officer in' and any consent was invalid") (emphasis in original). Similarly, in *United States v. Escobar*, the Eighth Circuit held that the defendant's consent to search his luggage was invalid because the officer falsely claimed that a drug-sniffing dog had alerted on the bag, which communicated that there was probable cause to search the bag, and the defendant had no choice but to permit it. *Escobar*, 389 F.3d at 786.

Unlike *Harrison* and *Escobar*, here, the police did not imply that Mr. Lee's refusal to consent might result in injury to any person or property, nor did the police make a false claim of legal authority to search the cab of the truck. Additionally, Mr. Lee was explicitly informed of his right to refuse consent to search when the agent read the consent to search form aloud to him (Doc. 117-1). These facts taken together negate the suggestion that the agent's misrepresentation rendered Mr. Lee's consent invalid.

### b.  Scope of Consent

Having concluded that Mr. Lee's consent was valid, the Court will now consider the scope of the consent. Specifically, the Court will analyze whether the scope of Mr. Lee's consent limited the police to searching only the trailer. "[T]he scope of a consent search is limited by the breadth of actual consent." *United States v. Breit*, 429 F.3d 725, 729 (7th Cir. 2005). To determine the scope of a defendant's consent, the court applies an objectively reasonable standard—"what would the typical reasonable person have

understood [the scope of consent to be] by the exchange between the officer and the suspect?" *Id.*; *United States v. Rahman*, 805 F.3d 822, 832 (7th Cir. 2015). "Whether a search remained within the boundaries of consent is a factual question that is determined by the totality of the circumstances." *Rahman*, 805 F.3d at 832.

The Government argues that when Mr. Lee signed the consent form, he agreed to an unlimited search of the trailer *and* the cab (Doc. 117). Mr. Lee claims, however, that the form was blank, and the description of the places or things to be searched was not filled out when he signed it (Docs. 98, 122). Even if the Court did not believe Mr. Lee's story, the Government's argument is not well-taken. The Seventh Circuit has repeatedly held that a general consent form is of little help in determining the scope of consent, and it can be overridden by a more explicit statement specifying the object of the search. *United States v. Breit*, 429 F.3d 725, 730 (7th Cir. 2005); *United States v. Lemmons*, 282 F.3d 920, 924 (7th Cir. 2002).

According to Mr. Lee, based on his exchanges with the agents, he thought he was consenting to a search of the trailer only. This seems completely reasonable to the Court. Agent Cook testified that he told Mr. Lee he was "investigating trucking companies and . . . asked him what he currently had in the *trailer* of his truck." Agent Cook further testified that he asked Mr. Lee if agents could "come out and take and look at what's in the back of his *trailer*."[7] And Agent Cupp testified that he told Mr. Lee he was assisting an FBI Office in Illinois in investigating a cargo freight issue,[8] and he understood that Mr. Lee had agreed to a search of "the truck and trailer." This testimony demonstrates

---

[7] Agent Cook's report matches this testimony (Doc. 117-1, p. 3).
[8] Agent Cupp's report indicates that he told Mr. Lee that "agents were investigating an issue with some freight that Lee possibly had picked up on his current haul" (Doc. 117-1, p. 5).

that the agents repeatedly referred to the trailer and the freight (which is obviously kept in the trailer), and only made one passing reference to the cab. Under these circumstances, the Court believes a reasonable person would think the agents wanted to look in the trailer.

But the Court also believes that a reasonable person would expect the agents to ask for the paperwork for the freight. Even if that is not true, in this case, Mr. Lee readily obliged Agent Cupp's request for the paperwork. The undisputed evidence indicates that Agent Cupp asked Mr. Lee if he had any paperwork for the cargo, and Lee indicated that the paperwork was in the cab of the truck. The men then walked from the trailer to the cab, where Mr. Lee pulled a key out of his pocket, unlocked the cab, and opened the door. At that point, Mr. Lee was asked to wait outside the cab while Agent Cupp climbed up and retrieved the paperwork. Mr. Lee testified that he intended to get the paperwork out of the cab for Agent Cupp. Mr. Lee further testified that he did not understand why Agent Cupp got in the cab, and he even asked Cupp as much. There is no evidence, however, that Mr. Lee ever objected to Agent Cupp being in the cab. In fact, at the hearing, when Mr. Lee's own attorney asked him whether he protested Agent Cupp getting into the cab, Lee answered, "I mean, it wasn't a problem for me."

Based on Mr. Lee's testimony, the Court concludes that even if Mr. Lee's consent was initially limited to the trailer, he implicitly expanded the scope of his consent after the search began by leading Agent Cupp to the cab, unlocking and opening the door, and allowing Agent Cupp to enter the cab of the truck without any objection. *See United States v. Guerrero,* 472 F.3d 784, 789–90 (10th Cir. 2007) ("Consent may instead be granted

through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."); *United States v. Lemmons*, 282 F.3d 920, 924 (7th Cir. 2002) ("[T]he scope of a search can be expanded by consent."). *See also United States v. Kelley*, 594 F.3d 1010, 1014 (8th Cir. 2010) (holding that police did not exceed defendant's consent by searching the shed, even though defendant's initial consent was limited to the house, because defendant told police he knew where the firearms were and led police out to the shed); *United States v. Malady,* 209 Fed.Appx. 848, 851–52 (10th Cir. 2006) (holding that the consent was valid where the "Appellant told the officer that the vehicle ownership papers the officer had requested were upstairs, then Appellant walked up the stairs without further conversation" and "[a]t no point did Appellant tell the officer to stay downstairs or otherwise indicate that the officer was not welcome to follow him"); WAYNE R. LAFAVE, 4 SEARCH & SEIZURE § 8.1(c) (5th ed.) ("[A]n initial consent limitation to a part of the premises should not prevail over a broader search prompted by the consenting party leading the police to another location where the items specified as the object of the search are located.")

So the police could get into the cab of the truck. And Agent Cupp testified that, as soon as he climbed up into the driver's seat, he noticed the M&M blanket. The photographs submitted to the Court corroborate Agent Cupp's testimony that the blanket was in plain view inside the cab (*see* Government's Exhibits 3, 5, 6, 7, 8, 10, 11). The photographs also demonstrate that the orange bucket was in plain view (*see id.*). Therefore, under the plain view exception to the Fourth Amendment's warrant requirement, Agent Cupp could seize the blanket and the bucket. Under this exception,

the police can seize an incriminating item that falls outside the scope of a consent search if (1) the officer was lawfully present in the place from where he viewed the item, (2) the item was in plain view, and (3) its incriminating nature was 'immediately apparent.'" *United States v. Cellitti*, 387 F.3d 618, 623 (7th Cir. 2004) (citation omitted).

None of these requirements is in doubt here. As the Court just explained, Mr. Lee voluntarily consented to Agent Cupp climbing into the cab for the purpose of looking at the paperwork for the freight. The blanket and the bucket were certainly within plain view, and their incriminating nature would have been immediately apparent to Agent Cupp based on his previous conversations with Agent Cook. Thus the seizure of the M&M blanket and orange bucket fell within the plain view exception and did not violate the Fourth Amendment.

Also, the discovery of the blanket and bucket, combined with the location data from the Tracfone, gave the police probable cause to search the entire cab of the semi-truck without a warrant pursuant to the automobile exception. Under this exception, the police are permitted to conduct a warrantless search of a vehicle so long as they have probable cause to believe it contains contraband or evidence of illegal activity. *United States v. Washburn*, 383 F.3d 638, 641 (7th Cir. 2004). "Probable cause to search exists where there is a fair probability that an officer will find contraband or evidence of illegal activity at a specified location based on the totality of the circumstances." *Id.* at 642 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "[T]his type of search lawfully extends to all parts of the vehicle in which contraband or evidence could be concealed . . . ." *United States v. Johnson*, 383 F.3d 538, 545 (7th Cir. 2004) (internal

quotation marks and citation omitted).

Agent Cupp's discovery of the blanket and bucket gave him reason to believe Mr. Lee's semi-truck was the scene of a crime and that other evidence of the crime may be in the cab. Therefore, he had probable cause to search the entire cab. The seizure of the other items—a cut zip tie, latex gloves, and the Motorola cell phone—thus fell within the automobile exception and did not violate the Fourth Amendment.

Mr. Lee argues that the motor vehicle exception does not apply here because he has an expectation of privacy in his truck that is heightened because he often slept in, and lived out of, the cab of his truck (Doc. 122, p. 8). He also seems to argue that the motor vehicle exception applies only to vehicles "on the road and in the process of transporting goods," so the exception does not apply here because his truck was not stopped by officers or in the process of transporting contraband (Doc. 122, pp. 7, 8). Neither argument is persuasive.

The policy justification for the automobile exception is two-fold. First, "a vehicle's 'ready mobility' . . . makes 'immediate intrusion' necessary to prevent the destruction of evidence." *United States v. Zahursky*, 580 F.3d 515, 522 (7th Cir. 2009) (citing *United States v. Washburn,* 383 F.3d 638, 641 (7th Cir. 2004)). Second, there is a reduced expectation of privacy with motor vehicles by virtue of the "pervasive schemes of regulation" to which automobiles are subject. *California v. Carney*, 471 U.S. 386, 392 (1985); *Zahursky*, 580 F.3d at 522 (citing *Washburn,* 383 F.3d at 641). The Supreme Court explained long ago that "[w]hen a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes—temporary

or otherwise—the two justifications for the vehicle exception come into play . . . [and] justify an immediate search before the vehicle and its occupants become unavailable." *California v. Carney*, 471 U.S. 386, 392-93 (1985).

Here, Mr. Lee was not under arrest or otherwise detained, and he had the keys to the truck. Thus the truck was "readily capable" of "being used on the highways." *Carney*, 471 U.S. at 392–93. Additionally, the truck bore no indicia of residential use that might give rise to an elevated privacy interest. It was parked in the parking lot of a grocery store; in other words, it was "found stationary in a place not regularly used for residential purposes." *Carney*, 471 U.S. at 392–93 (holding automobile exception applied to motorhome parked in parking lot in downtown San Diego). *See also United States v. Navas*, 597 F.3d 492, 501 (2d Cir. 2010) (holding automobile exception applied to a tractor trailer unhitched from its cab); *United States v. Smith*, 456 Fed.Appx. 200, 209 (4th Cir. 2011) (same).

Furthermore, relevant case law suggests the reduced expectation of privacy applies even more forcefully with regard to commercial trucks, regardless of whether the drivers sleep in them or not. *United States v. Navas*, 597 F.3d 492, 501 (2d Cir. 2010) ("Based on the nature and scope of the regulations relating to the commercial trucking industry, we are persuaded that defendants' reasonable expectations of privacy in the trailer were minimal."). *Cf. United States v. Delgado*, 545 F.3d 1195, 1201-02 (9th Cir. 2008) (holding interstate commercial trucking industry is pervasively regulated to an extent that justifies a warrantless administrative search of a tractor trailer); *United States v. Mitchell,* 518 F.3d 740, 751 (10th Cir. 2008) (same); *United States v. Maldonado*, 356 F.3d

130, 135 (1st Cir. 2004) (same); *United States v. Mendoza–Gonzalez,* 363 F.3d 788, 794 (8th Cir. 2004) (same); *United States v. Vasquez-Castillo,* 258 F.3d 1207, 1210 (10th Cir. 2001) (same); *United States v. Fort,* 248 F.3d 475, 480 (5th Cir. 2001) (same); *United States v. Dominguez-Prieto,* 923 F.2d 464, 468 (6th Cir.1991) (same). Under these circumstances, the Court has little difficulty concluding the automobile exception applied because the police had probable cause to believe there was evidence of criminal activity in the truck.

In sum, the Court concludes that the search of the cab on July 25th did not violate the Fourth Amendment; Mr. Lee consented to Agent Cupp getting into the cab of his truck, at which point the M&M blanket and orange bucket were in plain view, which gave the police probable cause to conduct a warrantless search of the cab pursuant to the automobile exception.

### 3. Was the Discovery Inevitable?

For the sake of argument, the Court assumes the opposite is true: that the search of the cab on July 25th violated the Fourth Amendment. The Government argues that the evidence seized is still admissible because the police would have legally and inevitably discovered it when they searched the truck following Mr. Lee's arrest on July 28th (Docs. 117, 129). The Court agrees.

"The doctrine of inevitable discovery provides that illegally obtained evidence will not be excluded if the Government can prove, by a preponderance of the evidence, that the officers 'ultimately or inevitably would have . . . discovered [the challenged evidence] by lawful means.'" *United States v. Marrocco*, 578 F.3d 627, 637 (7th Cir. 2009). "To satisfy this burden, the Government must demonstrate that two criteria are met:

First, it must show that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence; second, the Government must demonstrate that it would have conducted a lawful search absent the challenged conduct." *Id.*

The first prong of the inevitable discovery test has been met because the police could have obtained an independent legal basis for searching the semi-truck. In fact, that is exactly what happened. During the "consent" search of Mr. Lee's semi-truck on July 25th, the police observed and seized several items of note, including the M&M blanket, the orange bucket, and a zip tie. This evidence undoubtedly gave the police probable cause to arrest Mr. Lee, but the police chose not to do so. Instead, the police acted as though the July 25th search never happened. They allowed Mr. Lee to leave, and they continued their investigation. In particular, the police took another look inside and around the trashcan parked close to the truck, where they found the Tracfone and two zip ties. The police also re-reviewed surveillance footage from the Flying J on the day of the crime and observed Mr. Lee's white semi-truck pulling off the parking lot at approximately the same time that the victims claim they were abducted. And the police presented photo lineups to the victims, who both positively identified Mr. Lee as their assailant. These things gave the police probable cause to support the issuance of a warrant to search the cab of the semi-truck.

The Court is convinced that the police would have taken these same investigatory steps even in the absence of the July 25th search. In other words, the decision to continue the investigation did not hinge on the items found during the July 25th search. *See*

*Marrocco*, 578 F.3d at 638 ("This is not a case where the investigating officers learned new information during an illegal search and, based on that information, took investigatory steps that they would not have taken otherwise."). At the time of the July 25th search, the police had identified the Tracfone that the driver used to contact the victims, and the police were monitoring the location of that phone. The location pings led the police to the parking lot of Bill's Fresh Market in Jonesboro, Arkansas, where there was only one semi-truck parked on the lot. For the better part of twelve hours, the pings remained stationary in the parking lot, as did the truck. And the police had identified Malcolm Lee as the driver of the truck. Given this knowledge, it seems certain that even if the police had not already searched the truck, they would have taken additional steps to find the Tracfone, to identify Mr. Lee as the perpetrator, and to place his truck at the scene of the abduction.

The second prong of the inevitable discovery test has been met because the police inevitably would have sought a warrant and conducted a lawful search of the cab of the semi-truck. Simply put, it is unreasonable to think that, after obtaining a positive identification from both victims and surveillance footage of the semi-truck leaving the Flying J, the police would have failed to follow up and obtain a search warrant for Mr. Lee's truck and/or an arrest warrant. *See United States v. Pelletier*, 700 F.3d 1109, 1117 (7th Cir. 2012) ("It is unreasonable to think that, after Pelletier admitted to two FBI agents that he had child pornography, the FBI would have failed to follow up and obtain a search warrant."); *Marrocco*, 578 F.3d at 640 (holding it is unreasonable to conclude that officers would have failed to seek a warrant to search defendant's briefcase after they

knew he fit a drug-courier profile, he admitted his briefcase contained a large sum of money, and the dog-sniff test indicated that the briefcase carried the odor of drugs).

Mr. Lee argues that it is not clear that the items discovered in the truck on July 25th would still be there by the time the police obtained the warrant (Doc. 120, p. 13). The Court disagrees. The police obtained an arrest warrant for Mr. Lee on July 26th, only one day after the "consent" search. And it only took them another two days to find him and arrest him. So a total of three days had passed. If the items were in the truck for forty days following the incident, why wouldn't they be there for another three? Especially since common sense dictates that the items at issue—a blanket, a bucket, and a phone—can reasonably be expected to be kept for extended periods of time given that they are household items of long-term utility and not incriminating unless there is other evidence linking them to a crime. *Cf., e.g., United States v. Harju,* 466 F.3d 602, 608 (7th Cir. 2006) (holding that even though three weeks passed between the gun's sighting by a CI and the warrant's execution, reliance on the CI was not undermined because "unlike small amounts of drugs or cash, the gun was not likely to have been sold (or consumed) during that period"); *United States v. Singer,* 943 F.2d 758, 763 (7th Cir. 1991) (holding that an anonymous report alleging that the defendant possessed handguns about six months before the police investigated was not stale for purposes of establishing special circumstances to justify a no-knock entry because "firearms, unlike drugs, are durable goods useful to their owners for long periods of time"); SEARCHES AND SEIZURES, ARRESTS AND CONFESSIONS, § 4:8 (2d ed.) (explaining that nature of the property sought is relevant to the determination on the issue of staleness); WAYNE R. LaFAVE, 2 SEARCH & SEIZURE §

3.7(a) (5th ed.) (same).

Accordingly, the Court concludes that, even if the search of the cab on July 25th violated the Fourth Amendment, the items discovered during that search would have been found by the police during the search following Mr. Lee's arrest three days later on July 28th. Therefore, those items are admissible under the inevitable discovery doctrine.

In sum, Mr. Lee's Motion to Suppress Evidence is denied in its entirety.

### DEFENDANT'S AMENDED MOTION TO DISMISS INDICTMENT AND REQUEST FOR GRAND JURY TRANSCRIPTS

The focus of this motion is Count Three. In the original indictment, Count Three charged Mr. Lee with "coercion" under 18 U.S.C. 2422(a) for knowingly coercing the victims to travel in interstate commerce to engage in prostitution and in sexual activity for which he could be charged with criminal sexual assault (Doc. 25). Mr. Lee sought to dismiss Count Three for various reasons and asked for the grand jury transcripts (Doc. 88). The Government responded, in part, by obtaining a superseding indictment (Doc. 103). In the superseding indictment, Count Three was modified, and Mr. Lee is now charged with "enticement" in violation of §2422(a) for knowingly enticing the victims to travel in interstate commerce to engage in prostitution (Doc. 103). Once again, Mr. Lee seeks to dismiss Count Three (Doc. 112). He states that he "brings this motion on the grounds that the statute is unconstitutional as applied to [him]; that the indictment fails to state an offense pursuant to Fed. R. Crim. P 12(b); on the basis that Count [Three] is both duplicitous and multiplicitous; and on the basis of misconduct and other matters occurring before the grand jury pursuant to Fed. R. Crim. P. 6(e)(3)(c)(ii)." (Doc. 112).

*Duplicity/Multiplicity*

The argument regarding duplicity and multiplicity is completely undeveloped; aside from the introductory paragraph, the motion literally never mentions these words again (*see* Doc. 112). Not only is the argument undeveloped, but as the Government points out, it is also nonsensical because it is impossible for a count to be both duplicitous and multiplicitous (Doc. 115, p. 7). "Duplicity is the joining of two or more separate offenses in a single count of the indictment, while multiplicity is the charging of a single offense in separate counts of an indictment" (Doc. 115, p. 7). *United States v. Conley*, 291 F.3d 464, 469 n. 4 (7th Cir.2002); Fed. R. Crim. P.(12)(b)(3)(B)(i) and (ii). It appears that defense counsel threw out the terms as buzzwords, but they don't actually have any relevance here.

*Misconduct Before the Grand Jury*

Mr. Lee initially sought production of the grand jury transcripts regarding Count Three, which charged him with "coercion" under § 2422(a). He claimed it was likely that the grand jury was presented with false, deceptive, or incomplete evidence regarding the victims' interstate travel; that the Government failed to present exculpatory evidence; and that the Government relied excessively or improperly on hearsay evidence in presenting the case to the grand jury (Doc. 88). For these reasons, he claimed that the indictment must be dismissed (Doc. 88). As mentioned above, the Government then superseded the indictment and modified some of the charging language (*compare* Doc. 25 *with* Doc. 103). Mr. Lee argues that even if the Government's misconduct was eradicated from the new grand jury, he "nonetheless has a right to review the initial transcripts for due process violations and potential misconduct which may result in a

miscarriage of justice stemming from outrageous governmental conduct especially considering that defendant was incarcerated, and denied bail, for several months on the basis of that initial indictment" (Doc. 112, p. 3). Mr. Lee did not say anything more. Most notably, he does not make any assertions of prosecutorial misconduct with respect to the superseding indictment, which is the operative indictment in this case.

"Our judicial system consistently has recognized that the proper functioning of grand jury proceedings depends upon their absolute secrecy." *Matter of Grand Jury Proceedings, Special Sept., 1986*, 942 F.2d 1195, 1198 (7th Cir. 1991) (citing *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979)); *United States v. Puglia*, 8 F.3d 478, 480 (7th Cir. 1993) ("Grand Jury proceedings are cloaked in secrecy.") Under Rule 6(e)(3)(E)(ii), the court can authorize disclosure of grand jury materials only if the defendant overcomes the presumption of secrecy embodied in the grand jury process by showing a "compelling necessity" or a "particularized need" for the disclosure. FED. R. CRIM. P. 6(e)(3)(E)(ii); *Puglia*, 8 F.3d at 480; *Matter of Grand Jury Proceedings*, 942 F.2d 1198.

The undersigned finds that Mr. Lee has not made the requisite showing. First, the allegation that the prosecutor failed to present exculpatory evidence does not warrant disclosure of the transcripts. Mr. Lee does not identify what exculpatory evidence could or should have been presented (Docs. 88, 112). And the Supreme Court held over twenty years ago that a prosecutor has no duty to present exculpatory evidence to the grand jury. *United States v. Williams*, 504 U.S. 36 (1992); *accord United States v. Stout*, 965 F.2d 340, 343 (7th Cir. 1992); 1 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE CRIMINAL, §112 (4th ed.).

Second, the allegation that the prosecutor relied on hearsay evidence to obtain the indictment also does not warrant disclosure of the transcripts. It is well-established that an indictment can be based solely upon hearsay. *United States v. Rosario*, 234 F.3d 347, 352 (7th Cir. 2000) (citing *Costello v. United States,* 350 U.S. 359, 363 (1956)). Case law suggests, however, that a problem may arise if the prosecutor fails to inform the grand jurors that the evidence is hearsay (or misrepresents it as something other than hearsay) or relies excessively on hearsay. *See Rosario*, 234 F.3d at 352; *United States v. Flomenhoft*, 714 F.2d 708, 712 (7th Cir. 1983). Mr. Lee does not make either of these arguments.

Third, the allegation that the testimony presented to the grand jury relating to interstate travel was likely false or misleading does not warrant disclosure of the transcripts. In support of his argument, Mr. Lee relies exclusively on *United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974), which held that an indictment can be dismissed if it is based in part on perjured testimony (Doc. 88). *Basurto* is not good law in this Circuit, however, because the Seventh Circuit expressly declined to follow it (as have most others, and even the Ninth Circuit has called it into question). *See United States v. Udziela*, 671 F.2d 995, 1000 (7th Cir. 1982). According to the Seventh Circuit, even if a prosecutor knowingly used false testimony or failed to correct what he later learned was false testimony, the indictment should be dismissed "only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *United States v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005) (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988)). "In other words, '[a] district court may not dismiss an

indictment for errors in grand jury proceedings unless such errors prejudiced the defendants.'" *Vincent*, 416 F.3d at 600 (quoting *Untied States v. Mechanik*, 475 U.S. 66, 78 (1986)). Mr. Lee did not make either of those arguments (Doc. 112).

In sum, Mr. Lee has not sufficiently argued that he has a particularized need for the grand jury transcripts that necessitates breaking the secrecy of the grand jury's proceedings.

### Failure to State an Offense

Mr. Lee argues that Count Three of the superseding indictment is legally insufficient to charge the offense of enticement under 18 U.S.C. § 2422(a) (Doc. 112). The Court disagrees.

"To be sufficient, an indictment must state each element of the crimes charged, provide the defendant with adequate notice of the nature of the charges so that the accused may prepare a defense, and allow the defendant to raise the judgment as a bar to future prosecutions for the same offense." *United States v. Nayak*, 769 F.3d 978, 979-80 (7th Cir. 2014) (citation omitted). "The Supreme Court has held that '[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for a trial on the merits.'" *United States v. Greve*, 490 F.3d 566, 570-71 (7th Cir. 2007) (quoting *Costello v. United States,* 350 U.S. 359, 363 (1956)).

Mr. Lee does not challenge the indictment as facially insufficient (*see* Doc. 112). And, as the Government notes, the indictment largely mirrors the language of the statute (Doc. 123), and an indictment that "'tracks' the words of a statute to state the elements of the crime is generally acceptable . . . ." *United States v. White*, 610 F.3d 956, 958–59 (7th

Cir. 2010) (citing *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000)). *See also United States v. Resendiz–Ponce,* 549 U.S. 102, 109 (2007) (explaining that an indictment "parroting the language of a federal criminal statute" is sufficient so long as the crime is not one that must be charged with greater specificity).

Section 2422(a) provides:

> Whoever knowingly <u>persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce</u>, or in any Territory or Possession of the United States, <u>to engage in prostitution</u>, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 2422(a) (emphasis added)**.** In comparison, Count 3 of the Indictment charges that:

> On or about the 15th day of June, 2015, in Madison County, within the Southern District of Illinois, <u>Malcolm K. Lee, Sr.,</u> defendant herein, <u>knowingly persuaded, induced, and enticed A.J. and T.A. to travel in interstate commerce</u>, that is from Missouri to the Southern District of Illinois, <u>to engage in prostitution,</u> all in violation of Title 18, United States Code, § 2422(a).

(Doc. 103) (emphasis added).

In short, the superseding indictment alleges that Mr. Lee knowingly enticed the victims to travel in interstate commerce to engage in prostitution, and these allegations, if proved, are sufficient to establish a violation of § 2422(a). Thus, it appears that the indictment meets basic pleading requirements and is valid on its face.

Mr. Lee's argument is instead that "there is a complete lack of evidence to support the charges and the facts are contrary to the elements of the offense" (Doc. 112, p. 12). He

cites to and discusses case law regarding the knowledge and intent requirements of § 2422(a). In particular, he claims that the "preeminent characteristic" of the statute is that the defendant "transform or overcome" the victim's will (Doc. 112, p. 5). According to Mr. Lee, that means that "the victim [sic] must be convinced to do something they otherwise would not have done" (Doc. 112, p. 7). He claims that he didn't know the victims would travel across state lines, let alone intend for them to do so, and there is no evidence to the contrary (Doc. 112, p. 9). He also argues that the victims' interstate travel was for their own purposes and did not occur in relation to their encounter with him (Doc. 112). Defendant also argues that he did nothing to entice the victims or overcome their will; they were actively seeking customers, and he simply accepted their offer (Doc. 112).

The undersigned believes that Mr. Lee's argument is misguided. When evaluating the sufficiency of an indictment, the Court does not consider "whether any of the charges have been established by evidence or whether the government can ultimately prove its case." *United States v. White*, 610 F.3d 956, 959 (7th Cir. 2010). *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009) ("Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence.") (citations omitted). Instead, the court focuses on the allegations of the indictment, which it accepts as true. *Moore*, 563 F.3d at 586. *United States v. Todd*, 446 F.3d 1062, 1068 (10th Cir. 2006) ("On a motion to dismiss an indictment, the question is not whether the government has presented sufficient evidence to support the charge, but solely whether the allegations in the indictment, if

true, are sufficient to establish a violation of the charged offense." (citing *United States v. Sampson*, 371 U.S. 75, 78–79 (1962))). Mr. Lee is plainly challenging the evidence supporting the offense, which is an improper argument on a motion to dismiss the indictment.

In order to avoid this conclusion, Mr. Lee asserts that there is an exception to the general rule barring district courts from considering the sufficiency of the evidence at the Rule 12 stage when the actions of the defendant would not constitute a crime (Doc. 112, pp. 6, 7). Some circuits have acknowledged this exception in "rare" and "limited circumstances." *See, e.g., United States v. Todd*, 446 F.3d 1062, 1068 (10th Cir. 2006); 1A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE CRIMINAL, § 191 (4th ed.). Mr. Lee did not cite to any Seventh Circuit case endorsing that exception, however, and the Court did not come across any during the course of its own research. Even if the exception were authorized by the Seventh Circuit, it is inapplicable here. The exception only applies where "(1) the operative facts are undisputed, and (2) the government fails to object to the district court's consideration of those undisputed facts, and (3) the district court can determine from them that, *as a matter of law,* the government is incapable of proving its case beyond a reasonable doubt." *United States v. Pope*, 613 F.3d 1255, 1260 (10th Cir. 2010) (citations and internal quotation marks omitted) (emphasis in original). *See also United States v. Perez*, 575 F.3d 164, 166-67 (2d Cir. 2009) ("Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . . the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.").

Here, there is no indication that the operative facts are undisputed. Mr. Lee, of course, claims that he did not know the victims were going to travel across state lines to meet him, much less entice them to do so (Doc. 112). On the other hand, the Government claims the evidence suggests Mr. Lee knew the victims were in Missouri and would have to travel across state lines to meet him in Illinois (Doc. 115). Specifically, the Government claims the ad placed by the victims specified a location in Missouri, and the victims told law enforcement that they received Mr. Lee's response to the ad while they were in a motel in Fenton, Missouri (Doc. 115, pp. 4–5). In other words, questions remain regarding Mr. Lee's knowledge and intent, which are essential elements of the charged crime. The resolution of what he knew and what his intent was directly bear on the resolution of his guilt on Count Three. Therefore, these are questions that must be resolved by a jury following a trial, not by the Court on a pretrial motion.

### Constitutionality of § 2422(a)

Mr. Lee's final argument is that § 2422 is unconstitutionally vague as applied to him (Doc. 112, pp. 9, 12, 13–14). The Court disagrees.

"[A] statute is unconstitutionally vague so as to violate due process if it: "(1) does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or (2) fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the statute." *United States v. Plummer*, 581 F.3d 484, 488 (7th Cir. 2009). *Accord Skilling v. United States*, 561 U.S. 358, 402–03 (2010).

Mr. Lee claims that § 2422(a) was not designed to punish a john for simply patronizing a prostitute where the prostitute is "an offering and ready, willing and

happily abled adult prostitute [who] happens to cross state lines, between clients or for some other reason, before engaging in prostitution" (Doc. 112, p. 9). He further argues that there are no cases where a john was charged with violating §2422(a) for patronizing an adult prostitute who independently happens to cross state lines, let alone for patronizing a prostitute in her home state (Doc. 112, p. 9).

Mr. Lee is correct regarding the original intent of the statute and its modern-day application. Section 2422(a) was originally enacted to combat forced prostitution, as opposed to simply patronizing a prostitute. *See Mortensen v. United States*, 322 U.S. 369, 377 (1944) ("Congress was attempting primarily to eliminate the 'white slave' business which uses interstate and foreign commerce as a means of procuring and distributing its victims and 'to prevent panderers and procurers from compelling thousands of women and girls against their will and desire to enter and continue in a life of prostitution.'" (quoting H. Rep. No. 47, p. 10 (61st Cong., 2d Sess.)). And today, according to a 2015 law review article, § 2422(a) is "primarily directed" at "pimps, traffickers, and other sex abusers." Heather C. Gregorio, *More Than "Johns," Less Than Traffickers: In Search of Just and Proportional Sanctions for Buyers of Sex with Trafficking Victims*, 90 N.Y.U. L. Rev. 626, 638, n.52 (2015). In other words, it is directed at "those who control individuals in prostitution rather than . . . purchasers." *Id.* at 638.

Notably, that same law review article indicated that while "no case was found in which § 2422(a) was charged against a john," the statute can "be read to apply to johns as well." *Id.* at 638, n.52. Consequently, the Court does not see how the fact that no other johns have been charged with a violation of § 2422(a) means that it is unconstitutional to

charge Mr. Lee under that statute. Unfortunately, Mr. Lee did not explain as much or cite to any cases where the novel application of a criminal statute was held to be unconstitutional.

Additionally, as the Government pointed out, although the Seventh Circuit has not addressed whether § 2422(a) is void for vagueness, at least two other jurisdictions have rejected the argument. *United States v. Vancleaf*, 185 F.3d 876, *5 (10th Cir. 1999); *Scott v. United States*, No. 1:05-CR-00443, 2015 WL 4950033, at *3 (M.D. Pa. Aug. 19, 2015). Given that the challenged clause specifically prohibits enticing individuals to travel in interstate commerce for prostitution, the Court believes that ordinary people using common sense would understand that they cannot have a person travel from another state to have sex for money. *See Vancleaf*, 185 F.3d at *5.

In conclusion, Mr. Lee's motion to dismiss Count Three of the Superseding Indictment and his request for the release of the grand jury transcripts (Docs. 88, 112) are denied.

<u>CONCLUSION</u>

For the reasons set forth above, the Government's Motion to Strike Untimely Motion to Suppress Data Gathered Through Precision Location Warrant (Doc. 132) is **GRANTED**, Defendant's Amended Motion to Dismiss Indictment and Motion for Disclosure of Grand Jury Transcripts (Doc. 88; Doc. 112) is **DENIED**, and Defendant's Motion to Suppress Evidence (Doc. 98) is **DENIED.**

**IT IS SO ORDERED.**

**DATED:   July 28, 2016**

<u>s/ Nancy J. Rosenstengel</u>
**NANCY J. ROSENSTENGEL**
**United States District Judge**